# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 17-22446-CIV-ALTONAGA/Goodman

**HERBERT BAUSSIQUOT**,

      Plaintiff,

v.

**AKAL SECURITY, INC.**,

      Defendant.

_____/

## ORDER

**THIS CAUSE** came before the Court on the Defendant, AKAL Security, Inc.'s Motion

for Summary Judgment [ECF No. 23][1], and Plaintiff, Herbert Baussiquot's[2] Motion for Partial

Summary Judgment [ECF No. 25].[3]  The Court has carefully considered the parties' written

submissions and applicable law.

## I.     BACKGROUND

Defendant hired Baussiquot to work as an armed detention officer at the Krome

Detention Center in Miami, Florida, on July 1, 2014.  (*See* Def.'s SMF ¶ 1 (undisputed)).  Akal

---

[1] Plaintiff filed a Response ("Plaintiff's Response") [ECF No. 30], to which Akal filed a Reply ("Defendant's Reply") [ECF No. 33].  Akal also filed a Statement of Undisputed Material Facts ("Defendant's SMF") [ECF No. 22], to which Plaintiff filed a Response ("Plaintiff's SMF Response") [ECF No. 31].  Additionally, Akal filed Notices [ECF Nos. 21 & 27], with affidavits, excerpts from deposition transcripts, and other discovery materials.

[2] The Complaint [ECF No. 1-2] spells Plaintiff's name as "Herbert Baussiqout."  (Compl. 3).  The Court uses the spelling appearing in Plaintiff's Motion, "Herbert Baussiquot."  (*See* Pl.'s Mot. 1).

[3] Akal submitted an Opposition to Plaintiff's Motion ("Defendant's Opposition") [ECF No. 29], to which Baussiquot filed a Reply ("Plaintiff's Reply") [ECF No. 34].  Baussiquot filed a Statement of Undisputed Material Facts ("Plaintiff's SMF") [ECF No. 26], to which Akal filed a Statement of Material Facts in Opposition ("Defendant's SMF Opposition") [ECF No. 28].  Additionally, Baussiquot filed Appendices [ECF Nos. 24 & 32] with affidavits, excerpts from deposition transcripts, and other discovery.  In response to the Court's Order [ECF No. 50], Baussiquot filed additional excerpts from his deposition and his affidavit.  (*See* [ECF Nos. 51-1 & 51-2]).

had a subcontract with Akima Global Services, LLC, a contractor of Immigration and Customs Enforcement tasked with providing care, custody, and control of immigration detainees in federal custody at Krome. (*See id.* ¶ 2 (undisputed)). In 2014, Akal hired Baussiquot to work on the Akima/Akal Subcontract. (*See id*. ¶ 5 (undisputed)). Baussiquot was terminated on November 17, 2016. (*See* Pl.'s SMF ¶ 1; *see also* Def.'s SMF Opp'n ¶ 1).

**A. Baussiquot Took Intermittent FMLA Leave**

On June 20, 2016, Baussiquot requested intermittent Family and Medical Leave Act (FMLA) leave beginning on July 7, 2016, to care for his mother. (*See* Def.'s SMF ¶ 14 (undisputed)). Under the Akima/Akal Subcontract, Akima was responsible for processing and approving all requests for FMLA leave for both Akima and Akal officers. (*See id*. ¶ 12 (undisputed)). Baussiquot requested FMLA leave from Karen Sinanan, an Akima Human Resources Generalist responsible for processing and approving all requests for FMLA leave for both Akima and Akal officers. (*See id*. ¶ 13; *see also* Pl.'s SMF Resp. ¶ 13). Baussiquot's initial FMLA leave was approved for July 7, 2016 through October 8, 2016. (*See* Def.'s SMF ¶ 14 (undisputed)).

On September 2, 2016, Baussiquot informed Sinanan he needed additional intermittent FMLA leave to continue caring for his mother. (*See* Def.'s SMF ¶ 15 (undisputed)). Sinanan approved the request, allowing Baussiquot to continue his intermittent leave until December 31, 2016. (*See id*. (undisputed)). Baussiquot was never denied a request for FMLA leave. (*See id*. ¶ 19 (undisputed)). In total, Baussiquot took 44 days of intermittent FMLA leave. (*See* Pl's SMF ¶ 13 (undisputed)).

While on intermittent FMLA leave, Baussiquot took leave as needed and was not on a set leave schedule. (*See* Def.'s SMF ¶ 18 (undisputed)). The absences were then excused.

(*See* Pl.'s SMF ¶ 14 (undisputed)).   On the days Baussiquot needed FMLA leave and was scheduled to be at work, he would call a transportation supervisor and inform the supervisor he was taking FMLA leave that day.  (*See* Def.'s SMF ¶ 18 (undisputed)).  Throughout 2016, Akal Lieutenant, Lenora Seymour, was one of Baussiquot's supervisors.    (*See* Pl.'s SMF ¶ 4 (undisputed)).  According to Seymour, Akal policy requires that after a transportation supervisor is notified an officer is calling out for approved intermittent FMLA leave, the transportation supervisor must inform the officer's direct supervisor, who then assigns others to cover for the officer who is not coming to work.  (*See* Affidavit of Lenora Seymour ("Seymour Affidavit") [ECF No. 21-3] ¶¶ 1, 13).

Joe Olmedo, the Krome site manager and an Akal employee (*see* Joe Olmedo Deposition ("Olmedo Deposition") [ECF No. 24-3] 8:1–8), made inquiries regarding Baussiquot's FMLA absences (*see* Pl.'s SMF ¶ 15 (citing Olmedo Dep. 14:9–15:3, 23:23–24:9; Emails to Olmedo [ECF No. 24-12] 00391, 00400)).  Olmedo forwarded an email to Angela Robeson from Telise Gay, a transportation officer supervised by Olmedo (*see* Olmedo Dep. 9:22–10:6), in which she reported to Olmedo that Baussiquot had "called out" on September 7, 2016.  (*See* Olmedo's Email re: Plaintiff's FMLA Leave [ECF No. 32-12] 000375).  In the email to Robeson, Akal's Director of Detention Services, Olmedo added, "this employee is showing a pattern of FMLA call outs . . . I can[']t count on this officer showing up to work," and requested "one more hire to train as an armed officer so we can assist in eliminating the overtime caused by [Baussiquot]." (*Id*. 000375 (alterations added); *see also* Affidavit of Josephine Coker ("Coker Aff.") [ECF No. 21-1] ¶ 27)).

On September 19, 2016, Olmedo asked Sinanan for the dates Baussiquot was approved for FMLA leave, to which Sinanan responded by attaching Plaintiff's FMLA documentation.

(*See* Emails to Olmedo 00391). That same day, Olmedo received another e-mail notifying him Baussiquot had called out for 36 days of FMLA leave between July 10 and September 14, 2016. (*See id*. 00400).

### B. Baussiquot Missed a Quarterly Firearm Re-Qualification

As an armed detention officer, Baussiquot was required to attend quarterly firearm re-qualifications. (*See* Pl.'s SMF ¶ 18 (undisputed)). The firearm re-qualification training can be scheduled every two weeks or once a month, depending on operational needs, officers' availability and the availability of the range. (*See id*. ¶ 19 (undisputed)). The schedule for firearm re-qualification is created by the training manager and is then provided to the officer's supervisor and posted outside the office. (*See id*. ¶ 21 (undisputed)). Baussiquot completed a quarterly re-qualification in June 2016. (*See id*. ¶ 20 (undisputed)).

On September 24, 2016, Baussiquot received a call stating he was a "no call no show for his quarterly firearm requalification." (*Id*. ¶ 27 (undisputed)). Baussiquot states since he was on FMLA leave, he was not aware he had been placed on the schedule and was never notified by email or phone that he had been scheduled for his quarterly firearm re-qualification prior to September 24, 2016. (*See id.* ¶ 28 (citing Information Report Form [ECF No. 24-18] 00182–83; Pl.'s Dep. 187:3–16). According to Akal, Baussiquot was aware he was scheduled because Seymour notified Baussiquot by phone of the re-qualification, and regardless, Baussiquot could have called a supervisor to find out when he was scheduled. (*See* Def.'s SMF Opp'n ¶ 28 (citing Deposition of Lenora Seymour ("Seymour Dep.") [ECF No. 32-1] 65:14–22, 66:8–13)).

Baussiquot asked if he could attend the re-qualification course late, but the request was denied. (*See* Def.'s SMF ¶¶ 32–33 (citing Affidavit of Marc Elias ("Elias Aff.") [ECF No. 21-5] ¶¶ 14–16; Seymour Aff. ¶ 23; Pl.'s Dep. 180:7–18); Pl.'s SMF Resp. ¶ 32 (citing Pl.'s Dep.

183:1–14)). Baussiquot claims non-Haitian officers have been allowed to show up to re-qualifications late. (*See* Pl.'s Dep. 28:5–23). An Akal officer, Peterson Acluche, also testified that he saw non-Haitian officers arrive late to re-qualifications. (*See* Deposition of Peterson Acluche ("Acluche Deposition") 14:1–9, 66:10–14). Akal states it has no record of any officer being allowed to attend a quarterly firearm re-qualification late. (*See* Def.'s SMF ¶ 41 (citing Coker Aff. ¶ 45; Seymour Aff. ¶ 25; Elias Aff. ¶ 18)).

On September 26, 2016, Olmedo sent an email to Baussiquot stating Baussiquot was being removed from the schedule for failure to attend the quarterly firearm re-qualification on September 24, 2016, and notifying him the next qualification was scheduled for Saturday, October 8, 2016. (*See* Seymour Aff. Ex. A 00412). Baussiquot states while he was notified there was an upcoming qualification set to take place on October 8, 2016, it was not clear to him that he was scheduled to attend that day. (*See* Pl.'s SMF Resp. ¶ 36 (citing Pl. Aff. ¶ 19)). A Personal Action Report ("PAR") [ECF No. 32-26] was prepared on September 26, 2016, indicating Baussiquot was being suspended for 10 days because he was a "no call/no show" for quarterly firearm re-qualifications, which the PAR stated "triggered a hardship within the company: having to cover [his] assigned shifts and incurring nonsensical over time at an additional cost to the company." (*Id.* (alteration added)). Baussiquot was presented with the PAR on October 4, 2016. (*See* Pl.'s SMF ¶ 32 (citations omitted); Def.'s SMF Opp'n ¶ 32 (citation omitted)).

### C. Baussiquot is Accused of Handling his Firearm in an Unsafe Manner

The parties cannot agree about events that transpired on September 26, 2016 beyond the fact that Baussiquot went to the facility to meet with Seymour. (*See* Def.'s SMF ¶ 46 (citing Seymour Aff. ¶ 34; Pl.'s Dep. 199:20–22)).

According to Akal, Seymour instructed Plaintiff several times not to bring her his firearm and only to give her his gun locker key (*see* Def.'s SMF ¶ 48 (citing Seymour Aff. ¶ 38)); but Baussiquot walked to his gun locker and unlocked it (*see id.* SMF ¶ 50 (citing Seymour Aff. ¶¶ 39–40)), and then carried his firearm, baton, 3 magazines filled with ammunition, and a loose bullet to Seymour (*see id*. ¶ 51 (citing Seymour Aff. ¶ 41; Pl.'s Dep. 213:19–214:6, 215:21–24)). Akal claims Plaintiff handled his firearm in an unsafe manner when he removed it from his locker and carried the firearm without encasing it in a holster, gun box, or pouch (*see id*. ¶ 52 (citing Seymour Aff. ¶ 42)); and without first clearing his firearm with a gun-clearing barrel, in violation of company policy (*see id*. ¶ 53 (citing Seymour Aff. ¶ 43; Pl.'s Dep. 214:17–20)).

Baussiquot claims Seymour had asked him to come in to turn in his gun locker key and gun (*see* Pl.'s Dep. 200:1–22); and once he arrived, he also requested an inventory of his locker (*see id*. 207:16–23). In the past, when Baussiquot was removed from the schedule, an inventory of his locker was done and he was provided a record of the property he returned to Akal. (*See* Pl.'s SMF Resp. ¶ 49 (citing Pl.'s Dep. 284:24–285:25)). On September 26, 2016, Seymour declined to send someone to do an inventory of Baussiquot's locker (*see* Pl.'s Dep. 207:9–15), but did approve Baussiquot's request to go through his locker and show her everything issued to him (*see id.*). Baussiquot states he was authorized to approach his locker and so did not disregard Seymour's orders. (*See* Pl.'s SMF Resp. ¶ 51 (citing Pl.'s Dep. 207:9–15)). Baussiquot claims he safely retrieved his gun and walked it over to Seymour. (*See id*. ¶¶ 51–53 (citing Pl.'s Dep. 207:9–15, 214:7–16); Coker Aff. Ex. G 00461). While Baussiquot admits he carried the gun in his hands (*see id*. ¶ 54), he testified he carried the gun with Seymour's permission in order to bring the contents of his locker to her for inspection (*see id*. 207:1–15). Baussiquot also testified he made sure the weapon was not loaded. (*See* Pl.'s Dep. 214:7–16).

### D.  Baussiquot is Terminated

On October 11, 2016, Olmedo submitted a Disciplinary and Termination Request form and memorandum to Defendant's Employee Relations Manager, Josephine Coker.  (*See* Pl.'s SMF ¶ 33 (undisputed); *see also* Coker Aff. ¶ 1).   In addition to the Disciplinary and Termination Request form and memorandum, Coker received: (1) an Information Report Form prepared by Seymour; (2) an October 4, 2016 witness statement prepared by Baussiquot concerning the September 26, 2016 incident; (3) a Summary of Investigation Report prepared by Jorge Perez with findings from his investigation of the September 26, 2016 incident; (4) Baussiquot's acknowledgements of receipt of various policies and manuals; (5) Baussiquot's PAR for not attending the firearm re-qualification on September 24, 2016; and (6) an October 4, 2016 memo to Baussiquot concerning his removal from the schedule.  (*See* Def.'s SMF ¶ 62 (citing Coker Aff. ¶ 25); Coker Aff. Ex. G, 00452–65).   Coker asked Robeson to request additional information from Olmedo about the video surveillance (*see* Deposition of Josephine Coker ("Coker Dep.") [ECF No. 24-4] 86:12–16; Coker Aff. ¶ 27), which Olmedo produced in an affidavit (*see* Coker Aff. Ex. H, 00175–76).   Akal claims Coker then conducted an independent review of the documentation.  (*See* Def.'s SMF ¶ 65 (citing Coker Dep. 85:5–87:25)).

Ultimately, Coker recommended Baussiquot be terminated, explaining it was "because of his violation of numerous company policies and procedures, in particular, his firearm violations, his unauthorized firearm handling, his failure to follow policies and procedures regarding firearms, and his insubordination."  (Coker Aff. ¶ 29).  At the time, Coker had no knowledge of Baussiquot's national origin or FMLA leave, including the reason Baussiquot needed FMLA leave.  (*See* Def.'s SMF ¶ 68 (undisputed)).  Coker met with Carol Frost, Akal's then-director of

Human Resources, and recommended Baussiquot be terminated. (*See* Coker Aff. ¶ 30). Frost approved the termination. (*See id.*). On November 17, 2016, Coker sent a letter informing Baussiquot his employment was terminated effective immediately. (*See* Def.'s SMF ¶ 67 (citing Coker Aff. ¶¶ 31–33; *id.* Exs. I & J); *see also* Termination Letter [ECF No. 32-30]).

### E. Complaint

On May 23, 2017, Baussiquot filed his Complaint alleging Akal retaliated against him for taking FMLA leave; interfered with his ability to take leave; and terminated him based on his taking FMLA leave, his association to an individual with a disability, and his national origin. (*See generally* Compl.). On June 30, 2017, Akal filed a Notice of and Petition for Removal [ECF No. 1]. Thereafter, Baussiquot filed an Amended Complaint [ECF No. 13] alleging: (1) retaliation under the FMLA (Count I) (*see id.* ¶¶ 25–38); (2) interference under the FMLA (Count II) (*see id.* ¶¶ 39–47); (3) disability discrimination in violation of the Americans with Disabilities Act (Count III) (*see id.* ¶¶ 48–64); (4) discrimination based on national origin in violation of the Florida Civil Rights Act ("FCRA") (Count IV) (*see id.* ¶¶ 65–83); and (5) violation of Title VII of the Civil Rights Act of 1964 for discrimination based on national origin (Count V) (*see id.* ¶¶ 84–104). Baussiquot seeks declaratory and injunctive relief as well as lost wages and benefits; compensatory damages for emotional distress, embarrassment, and humiliation; reinstatement; and attorneys' fees. (*See generally id.*).

## II. LEGAL STANDARD

Summary judgment shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn

from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted), and "resolve all reasonable doubts about the facts in the favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990) (citation omitted).

"An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (per curiam) (internal quotation marks omitted) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Channa Imps., Inc. v. Hybur, Ltd.*, No. 07-21516-CIV, 2008 WL 2914977, at *2 (S.D. Fla. July 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (alterations and internal quotation marks omitted)). While the burden on the movant is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *See Anderson*, 477 U.S. at 252.

A mere "scintilla" of evidence in favor of the nonmoving party, or evidence that is merely colorable or not significantly probative is not enough. *See id.*; *see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (citations omitted). "The plain

language of Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (alterations and internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 322).

## III. ANALYSIS

Akal argues it is entitled to summary judgment on all counts because Baussiquot was disciplined and terminated for legitimate, non-discriminatory reasons, including "handling a firearm without authorization, mishandling a firearm, and insubordination related to a firearm at a federal detention center." (Def.'s Mot. 1). Baussiquot requests the Court deny Akal's Motion because Akal fails to demonstrate there are no disputed material facts. (*See generally* Pl.'s Resp.).

For his part, Baussiquot argues Akal unlawfully interfered with his FMLA leave by scheduling him for his quarterly firearm re-qualification while he was on FMLA leave; causing him to miss the firearm re-qualification, which led to him being disciplined and later terminated. (*See generally* Pl.'s Mot.). While Baussiquot requests partial summary judgment against Akal on Counts I and II, he later concedes "there are genuine disputes of material fact that simply cannot be resolved on motions for summary judgment" pertaining to the Count II FMLA retaliation claim. (Pl.'s Reply 10). Akal argues Baussiquot "routinely misstates the record evidence . . . tak[ing] positions that are flatly contracted by the evidence," and insists the record and applicable law show it is Akal that is entitled to summary judgment on all claims. (Def.'s Opp'n 1 (alterations added)).

The Court considers the parties' competing positions.

### A. Family Medical Leave Act (Counts I & II)

The FMLA grants an eligible employee up to 12 work weeks of leave annually where an employee must "care for [a] spouse, or a son, daughter, or parent, . . . if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C) (alterations added). Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the Act. *Id.* § 2615(a)(1). The prohibition against interference prohibits an employer "from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights," or from using "FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c).

As an enforcement mechanism, the "Act creates a private right of action to seek equitable relief and money damages against employers who 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights." *Hurlbert v. St. Mary's Health Care Sys.*, 439 F.3d 1286, 1293 (11th Cir. 2006) (quoting 29 U.S.C. §§ 2615(a)(1), 2617(a)) (other citation omitted). The Eleventh Circuit has recognized two types of FMLA claims: interference claims, in which an employee asserts his employer denied or *otherwise* interfered with his substantive rights under the Act, *see* 29 U.S.C. § 2615(a)(1); and retaliation claims, in which an employee asserts his employer discriminated against him because he engaged in activity protected by the Act, *see id.* § 2615(a)(2). *See Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001).

#### 1. FMLA Retaliation Claim (Count I)

To succeed on a retaliation claim, "an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207 (citation omitted). "In other words, a

plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" *Id.* (quoting *King v. Preferred Tech. Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)). "Where, as here, a plaintiff alleges an FMLA retaliation claim without direct evidence of the employer's retaliatory intent, [courts] apply the burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)." *Hurlbert*, 439 F.3d at 1297 (alteration added; citation omitted).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of retaliation, showing: (1) he engaged in statutorily protected activity; (2) he experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *See id.* (citations omitted). "If the employee makes out a prima facie case, the burden then shifts to the [employer] to articulate a legitimate reason for the adverse action." *Id.* (alteration added; citation omitted). If the employer is able to do so, the employee must then show the employer's proffered reason for the adverse action is pretextual "by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Giles v. Daytona State Coll., Inc.*, 542 F. App'x 869, 874 (11th Cir. 2013) (internal quotation marks omitted) (quoting *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1268 (11th Cir. 2008)).

Baussiquot claims Akal retaliated against him by terminating him while he was on intermittent FMLA leave. (*See* Pl.'s Mot. 10; Pl.'s Resp. 3). It is undisputed Baussiquot engaged in statutorily protected activity by taking intermittent FMLA leave to care for his mother and his termination is an adverse employment action. (*See generally* Def.'s Opp'n;

Def.'s Mot; Def.'s Reply). Thus, the Court turns to the third prong and considers whether there is evidence of a causal connection between Baussiquot's FMLA leave and his termination.

"To establish a causal connection, a plaintiff must show that the relevant decisionmaker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013) (quoting *Shannon v. BellSouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)). Close temporal proximity between protected conduct and an adverse employment action may be "sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Hurlbert*, 438 F.3d at 1298 (quoting *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)). Nevertheless, an employee's intervening misconduct may diminish any causal connection that could otherwise be inferred from the temporal proximity. *See Henderson v. FedEx Express*, 442 F. App'x 502, 507 (11th Cir. 2011).

Akal argues Baussiquot cannot show a causal connection between his FMLA leave and Akal's decision to terminate him because the decisionmakers had no knowledge of Baussiquot's FMLA leave. (*See* Def.'s Mot 5–6). While Akal argues Coker and Frost — and not Olmedo — made the decision to terminate Baussiquot (*see id.* 6), Olmedo initiated proceedings against Baussiquot by submitting a Disciplinary and Termination Request form (*see* Pl.'s SMF ¶ 33 (undisputed)).

Furthermore, Coker relied on Olmedo's review of a critical piece of evidence — surveillance video of the September 26, 2016 incident Akal claims is the reason for Baussiquot's termination — in order to decide to recommend termination. (*See* Coker Aff. ¶¶ 27–28). Consequently, even assuming only Coker and Frost can be viewed as decisionmakers for purposes of establishing a causal connection between Plaintiff's FMLA leave and his

termination, Olmedo's influence on the decision to terminate Plaintiff also suffices to establish a causal connection. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) ("[C]ausation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee." (alteration added)); *see also Hyde v. K.B. Home, Inc.*, 355 F. App'x 266, 273 (11th Cir. 2009) (imputing a non-decision maker's animus to a neutral decisionmaker in an FMLA case).

The Court turns to whether there is sufficient evidence Baussiquot's FMLA leave and his termination are not wholly unrelated.

First, Baussiquot argues the close temporal proximity of his FMLA leave and evidence of Olmedo's frustration regarding his leave together are sufficient to establish his FMLA leave was not wholly unrelated to his later termination. (*See* Pl.'s Mot. 10). The Court agrees. While Akal argues a five month period between engaging in protected activity and adverse employment action is insufficient to establish causation (*see* Def.'s Opp'n 11 (citation omitted)), the Eleventh Circuit recently held for purposes of establishing a causal connection, temporal proximity should be measured from the last day of the employee's FMLA leave. *See Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1272 (11th Cir. 2017) ("We now hold that temporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs.").

As Baussiquot was terminated during the period of time he was approved for intermittent FMLA leave (*see* Def.'s SMF ¶¶ 14–15 (undisputed)), he establishes a "very close" temporal proximity, which itself satisfies the causation requirement. *Thomas v. Cooper Lighting, Inc.*, 506

F.3d 1361, 1364 (11th Cir. 2007); *see also Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (finding seven weeks was sufficiently close to create a causal nexus for purposes of establishing a prima facie case).

Second, Baussiquot argues the element of causation is satisfied by evidence of Olmedo's discriminatory animus. (*See* Pl.'s Mot. 10 (citation omitted)). Olmedo inquired about the FMLA leave (*see* Emails to Olmedo 00391, 00400), and expressed frustration that he could not "count on this officer showing up to work," necessitating "one more hire to train as an armed officer so we can assist in eliminating the overtime caused by [Baussiquot]," (Olmedo's Email re: Pl.'s FMLA Leave 000375 (alteration added)). As such, Baussiquot establishes a causal connection between the FMLA leave and his termination to establish a *prima facie* case of FMLA retaliation.

Akal contends any causal connection that may be inferred is severed by Baussiquot's intervening misconduct on September 26, 2016, when "Plaintiff handled a firearm without authorization, mishandled that firearm, and was insubordinate with respect to that firearm." (Def.'s Opp'n 9–10 (citation omitted)). The assertion is inappropriate at summary judgment. Akal's claim Baussiquot mishandled his firearm in an unsafe manner and violated company policy (*see* Def.'s SMF ¶¶ 48–50) is disputed: Baussiquot states he retrieved his gun safely after being authorized to do so (*see* Pl.'s Dep. 207:1–5, 214:7–16). While *undisputed* evidence of intervening misconduct can break the causal link between a plaintiff's protected activity and an adverse employment action, *see Henderson*, 442 F. App'x at 506, the intervening misconduct here is itself in dispute and does not serve to break the causal link. As such, the Court finds Baussiquot establishes a *prima facie* case of FMLA retaliation.

In claiming to have terminated Baussiquot for mishandling his weapon on September 26, 2016, Akal has met its burden of producing a legitimate, nondiscriminatory reason for the termination. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). Again, Baussiquot "recounts a very different scenario" of what occurred on September 26, 2016, insisting Akal's reason for terminating him is pretextual since it was "based on a faulty investigation conducted with the intent of terminating Plaintiff prior to its completion." (Pl.'s Reply 10). Furthermore, the Termination Letter is vague, stating only that Akal "lost confidence in [Baussiquot's] ability to properly carry out [his] duties." (Termination Letter (alterations added)). Given Olmedo's statements and the disputed facts regarding the events of September 26, 2016, Baussiquot presents sufficient evidence to allow a reasonable jury to conclude he was terminated in retaliation for taking intermittent FMLA leave.

Summary judgment on the FMLA retaliation claim in Count I is denied.[4]

### 2. FMLA Interference Claim (Count II)

Interference claims under the FMLA are those "in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act." *Hurlbert*, 439 F.3d at 1293 (internal quotation marks and citation omitted). To establish an inference claim, a plaintiff is required to demonstrate by a preponderance of the evidence that he was "entitled to the benefit denied." *Strickland*, 239 F.3d at 1207 (citations omitted). Furthermore, a plaintiff must show he has in some way been prejudiced or harmed by the interference, and the harm is remediable by damages or equitable relief. *See Evans v. Books-A-Million*, 762 F.3d 1288, 1296 (11th Cir. 2014).

---

[4] In his Response to Akal's Motion, Baussiquot also suggests he can satisfy the standard for a mixed motive analysis. (*See* Pl.'s Resp. 2 (citing *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016))). The Court does not decide whether that standard is applicable here given Baussiquot has produced sufficient evidence under the more stringent *McDonnell Douglas* burden-shifting framework.

It is undisputed that Baussiquot was entitled to and was granted intermittent FMLA leave. (*See* Pl.'s Mot. 6; *see also* Def.'s Opp'n 3). The parties' disagreement centers around: (1) whether an employee can establish an FMLA interference claim despite evidence his requests for leave were approved by his employer; and (2) if so, whether Baussiquot can establish Akal's actions constitute interference under the FMLA. (*See* Def.'s Mot. 9–10; Pl.'s Resp. 7–9; Pl.'s Mot. 1–5).

Akal emphasizes it did not deny any of Baussiquot's requested FMLA leave and so concludes the interference claim must fail. (*See* Def.'s Mot. 9 (citing Pl. 147:24–148:5)). Baussiquot argues an employer's refusal to authorize FMLA leave is not the only form of interference contemplated under the FMLA, providing other examples of interference, such as: "manipulation to avoid responsibilities under the FMLA, and changing the essential functions of the job in order to preclude the taking of leave." (Pl.'s Mot. 5 (internal quotation marks omitted) (quoting *Juback v. Michaels Stores, Inc.*, No. 8:14-CV-00913-T-27, 2014 WL 3720540, at *3 (M.D. Fla. July 23, 2014))). Baussiquot's point is well-taken. FMLA regulations make clear denial of an employee's benefits through interference "include[s] . . . not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b) (alterations added). *See also Diamond v. Hospice of Fla. Keys, Inc.*, 677 F. App'x 586, 592 (11th Cir. 2017) (citation omitted)). The Court turns to the question whether Plaintiff establishes Akal's actions constitute interference.

Baussiquot argues Akal interfered with his FMLA leave when Seymour scheduled him for his quarterly firearm re-qualification while he was on leave. (*See* Pl.'s Mot. 5–7).[5] Akal

---

[5] Akal claims Baussiquot has not previously premised his FMLA interference claim on being required to work while on FMLA leave and is asserting a claim not found in the Amended Complaint. (*See* Def.'s Opp'n 2). Baussiquot notes he alleges he was scheduled for a quarterly firearm qualification while on FMLA leave and suspended pending an investigation (*see* Pl.'s Reply 1 (citing Am. Compl. ¶¶ 43–44)).

explains Baussiquot was not scheduled for a re-qualification during his FMLA leave because he was not scheduled to take intermittent FMLA leave on September 24, 2016, nor did he request leave for that date. (*See* Def.'s Opp'n 3 (citing 29 C.F.R. § 825.303(c))). While Baussiquot presents evidence showing he took FMLA leave from September 15 through September 22, 2016 (*see* Pl.'s Reply 4 (citing Pl.'s SMF Resp. ¶ 91)), Akal is correct in pointing out Baussiquot was not on FMLA leave on September 24, 2016.

Baussiquot next claims he was unaware he was scheduled for a quarterly firearm re-qualification because his supervisor decided to put him on the schedule for the September 24, 2016 quarterly firearm re-qualification while he was on leave. (*See id.*; *see also* Pl.'s Aff. [ECF No. 51-2] ¶ 8). Baussiquot states that prior to his week of leave beginning September 15, he was not scheduled to work on September 24, 2016, and thus would have had no reason to notify his employer he was taking FMLA leave on that day. (*See* Pl.'s Reply 2 n.1 (citing Hours Log [ECF No. 32-18)). Furthermore, it was Akal's practice to post the schedule on the employee bulletin board outside the transportation supervisor's office once employees were scheduled for their quarterly firearm schedules. (*See* Def.'s SMF ¶ 20 (undisputed)). Baussiquot's name would thus have been placed on the bulletin board while he was on leave. The week leading up to the quarterly firearm re-qualification, Baussiquot would have had no reason to go to work, and so would not have seen any new announcements on the bulletin board. The only way for Baussiquot to have known he was scheduled for the re-qualification was through notification by his supervisor.

Akal does not present any evidence Baussiquot received an email notification. (*See generally* Def.'s Mot.; Def.'s SMF; Def.'s Reply; Def.'s SMF Opp'n; Def.'s Opp'n). Instead,

---

It therefore appears Baussiquot is not presenting a new claim, but rather emphasizing different allegations found in his Amended Complaint.

Akal claims Baussiquot was notified about the September 24, 2016 firearm re-qualification by phone, relying on Seymour's testimony that she generally phoned officers to inform them of schedule changes. (*See* Def.'s Opp'n (citing Seymour Dep. 65:14–22, 66:8–13)). Yet, Baussiquot testified he was never notified by email or phone that he was scheduled to attend the September 24, 2016 quarterly firearm re-qualification until the morning of the re-qualification, when Seymour phoned him and told him he was a "no call no show." (Pl.'s Dep. 283:13–284:3).

Baussiquot's version of the facts — namely that he was never notified he was scheduled to come in for a quarterly firearm re-qualification on September 24, 2016 — could support an inference that Akal supervisors, either knowingly or unknowingly "sought to discourage [Baussiquot] from taking [continuous] FMLA leave" by making it difficult for him to stay abreast of staffing changes and scheduling unless he was physically coming into work. *Diamond*, 677 F. App'x at 594 (alterations added); *cf. Franks v. Indian Rivers Mental Health Ctr.*, No. 7:08-CV-1035-SLB, 2012 WL 4736444, at *17 (N.D. Ala. Sept. 30, 2012) ("Asking or requiring an employee to perform work during FMLA leave can constitute interference with that employee's FMLA rights." (citation omitted)). Baussiquot also provides evidence to support an inference that missing his quarterly firearm re-qualification prejudiced him, since it led to his removal from the schedule (*see* Letter Removing Plaintiff From Schedule [ECF No. 32-37]), suspension actions against him (*see* PAR), and possibly his termination (*see* Termination Letter). *See Evans*, 762 F.3d at 1296. Drawing all reasonable inferences in Baussiquot's favor, a genuine issue of fact remains regarding whether Akal discouraged Baussiquot from taking FMLA leave. Accordingly, summary judgment is denied as to Count II.

**B. Discrimination under the ADA (Count III)**

To succeed on an association discrimination claim under the ADA, a plaintiff must establish a *prima facie* case that: (1) he was subjected to an adverse employment action; (2) he was qualified for the job; (3) his employer knew at that time he had a relative with a disability; and (4) the adverse employment action occurred under circumstances which raise a reasonable inference the relative's disability was a determining factor in the employer's decision. *See Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) (citation omitted). Akal argues Baussiquot cannot establish a *prima facie* case of association discrimination under the ADA because he: (1) was unqualified for his job after missing the quarterly firearm re-qualification; (2) has not established Akal had knowledge of Baussiquot's mother's disability; and (3) has not put forth sufficient evidence the mother's disability was a determining factor in Akal's decision to terminate him. (*See* Def.'s Mot. 12–15).

The Court begins by addressing Akal's argument that although Olmedo and Seymour were aware Baussiquot was using FMLA leave to care for his mother, they did not have any knowledge Baussiquot's mother had a disability. (*See* Def.'s Mot. 13 (citing Pl.'s Dep. 281:9–19; Seymour Dep. 114:3–18; Seymour Aff. ¶ 64)). While Baussiquot asserts both Seymour and Olmedo were aware his absences were due to his mother's disability (*see* Pl.'s Resp. 10 (citing Pl.'s SMF Resp. ¶ 93)), his claims are not supported by the record evidence. (*See* Def.'s Reply 8 (citations omitted)). Baussiquot cites to his Statement of Material Facts for the proposition Seymour and Olmedo were aware his absences were due to his mother's disability (*see* Pl.'s Resp 10 (citing Pl.'s SMF Resp. ¶ 93)), yet, the paragraph he cites to merely states "Olmedo made several inquiries regarding Plaintiff's FMLA absences despite the fact that it was not within his duties." (Pl.'s SMF Resp. ¶ 93 (citing Olmedo Dep. 14:9–15:3, 23:23–24:9; Emails

from Olmedo 000391, 000400)).  Furthermore, neither Olmedo's Deposition nor the Emails from Olmedo establish Olmedo was aware Baussiquot's mother suffered from a disability.  (*See generally* Olmedo Dep.; Emails from Olmedo 000391, 000400).

The only other evidence Baussiquot presents of Olmedo and Seymour's supposed knowledge of his mother's disability is the email from Sinanan to Olmedo.  (*See* Pl.'s Resp. (citing Emails from Olmedo 000391, 000400)).  Specifically, Baussiquot asserts "[o]n September 19, 2016, Olmedo received an email from Karen Sinanan which **may have** contained the medical certification that Plaintiff submitted in support of his FMLA request."  (*Id*. (alteration and emphasis added) (citing Emails from Olmedo 000391, 000400)).  Baussiquot's speculation as to what may have been attached to the email sent from Sinanan to Olmedo is insufficient evidence Akal was aware of the mother's disability.  *See Garmon v. Vilsack*, 820 F. Supp. 2d 1357, 1365 (S.D. Fla. 2011) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions or rumors.").  For this reason alone, Baussiquot fails to establish his employer was aware of his mother's disability.

Furthermore, it is unclear what, if any, disability, Baussiquot's mother suffered from. When asked about his mother's disability during his deposition, Baussiquot stated his mother suffered a stroke, necessitating his assistance.  (*See* Pl.'s Dep. 141:23–242:6).  Akal correctly points out a stroke is not a qualified disability under the ADA.  (*See* Def.'s Reply 9 n.10 (citing *Sonnier v. Computer Programs & Sys., Inc*. 168 F. Supp. 2d 1322, 1329 (S.D. Ala. 2001) (other citations omitted)).  It is not clear whether Baussiquot's mother was suffering from any other condition that could be considered a disability covered by the ADA; or if she was, that Baussiquot's employer was made aware of the fact.  As a result, Baussiquot has not made a

*prima facie* showing of association discrimination. Summary judgment is granted as to Count III.

## C. National Origin Discrimination Under the FCRA and Title VII (Counts IV and V)

To succeed on a claim of national origin discrimination under Title VII or the FCRA, a plaintiff must first establish a *prima facie* case that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) his employer treated similarly situated employees outside his protected class more favorably; and (4) he was qualified for the position. *See Evans*, 762 F.3d at 1297; *see also Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998) (holding a claim under the FCRA is analyzed under the same standards as a Title VII claim).

Baussiquot satisfies the first two elements of a *prima facie* case: (1) he is a black Haitian-American (*see* Acluche Dep. 32:23–24), and (2) he was terminated (*see* Termination Letter). Thus, the remaining issues are whether Baussiquot's employer treated similarly situated employees outside his protected class more favorably, and whether Baussiquot was qualified for the position he held with Akal.

Akal argues Baussiquot fails to establish a *prima facie* case of national origin discrimination in his termination because (1) he fails to identify a comparator who was treated more favorably; and (2) at the time of his termination, he had not completed his quarterly firearm re-qualification and so could not perform the role of an armed detention officer. (*See* Def.'s Mot. 15–16). Baussiquot asserts he establishes a *prima facie* case of national origin discrimination with evidence that unlike other non-Haitian officers, he was not allowed to enter the firearm re-qualification late, which led to him being disciplined and contributed to his termination. (*See* Pl.'s Resp. 11).

Baussiquot offers three non-Haitian officers as comparators — Lewis, Morales, and Simon — all of whom he claims were allowed to attend quarterly firearm re-qualifications despite arriving late. (*See* Pl.'s Resp. 11; *see also* Pl.'s Dep. 268:11–23). Without explanation or citations to authority, Akal states the individuals Baussiquot identifies are not proper comparators and as such Akal "cannot, and is not required to, rebut this claim." (Def.'s Reply 9). The Court is left to guess at why the three men are not proper comparators.

Akal does point to Acluche's testimony stating he was allowed to arrive late to quarterly firearm re-qualification, highlighting that Acluche, like Baussiquot, is Haitian-American. (*See id.* 10 (citing Acluche Dep. 27:1–23, 36:22–24, 62:17–18, 73:24–74:21)). Yet, Akal fails to provide the Court with any authority that evidence of one similarly situated individual of the same protected class as a plaintiff forecloses a national origin employment discrimination claim, or that it renders insignificant a plaintiff's identification of three comparators in establishing a *prima face* case. Baussiquot has identified comparators — Lewis, Morales, and Simon — who were more favorably treated than he.

Akal argues Baussiquot was not qualified to be an armed detention officer at the time of termination because he did not complete his third quarter firearm re-qualification and mishandled his firearm in an unsafe manner. (*See* Def.'s Mot. 12–13). Akal accuses Baussiquot of failing to respond to its arguments regarding his lack of qualification for the position of armed Detention Officer at the time he was terminated. (*See* Def.'s Reply 9).

According to Baussiquot, he was not allowed to enter the firearm re-qualification on September 24, 2016 because "Haitian officers were not afforded the same opportunity" to come in late that other non-Haitian officers were afforded. (Pl.'s Resp. 11 (citing Pl.'s SMF Resp. ¶¶ 42–45)). Again, Plaintiff contends Akal took discriminatory action against him on September

24, 2016 by not allowing him to attend the quarterly firearm training due to his national origin. The facts as articulated by Baussiquot could support an inference this discriminatory action triggered his removal from the schedule and suspension, making it impossible for him to requalify before his termination. Thus, whether Baussiquot was qualified to serve as an armed detention officer at the time of his termination is not dispositive for purposes of establishing a *prima facie* case of national origin discrimination — the relevant inquiry is whether Baussiquot was qualified on September 24, 2016.

To be qualified for the position, Baussiquot was required to attend quarterly firearm re-qualifications. (*See* Pl.'s SMF ¶ 18 (undisputed)). Since Baussiquot completed a firearm re-qualification on June 2016 for the second quarter of the year (*see id.* ¶ 20 (undisputed)), and the September 24, 2016 firearm re-qualification took place before the end of the third quarter of the year (*see* Seymour Aff. ¶ 22), Baussiquot was qualified to be an armed Detention Officer on September 24.

With regard to Akal's argument Baussiquot was not qualified to serve as an armed detention officer because he mishandled a firearm on September 26, 2016 (*see* Def.'s Mot. 13), this is a disputed fact, *see supra* III.A.1. Drawing all reasonable inferences in favor of Baussiquot, the Court finds he establishes a *prima facie* case of national origin discrimination.

Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to set forth a legitimate, non-discriminatory reason for the adverse employment action. *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (citation omitted). If an employer meets its burden of providing a legitimate reason for the adverse action, a plaintiff must show a jury could reasonably infer an employer's justification was pretextual in order to withstand summary judgment. *See Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011);

*see also Walach v. Shineski*, No. 11-80412, 2012 WL 664277, at \*3 (S.D. Fla. Feb. 28, 2012),

*aff'd sub nom.*, *Walach v. Sec'y, U.S. Dep't of Veterans Affairs*, 519 F. App'x 607 (11th Cir.

2013).

Akal states Baussiquot was not terminated for failing to attend the quarterly firearm re-

qualification session, but rather because he mishandled a firearm and was insubordinate on

September 26, 2016. (*See* Def.'s Mot. 16, Def.'s Reply 10). Akal has articulated a non-

discriminatory reason for Baussiquot's termination. Baussiquot correctly points out "whether

Plaintiff did in fact violate Defendant's policies" on September 26, 2016 is entirely in dispute.

(Pl.'s Resp. 12). While Akal contends the events of September 26, 2016 are the reason

Baussiquot was terminated, again, Plaintiff presents a picture of a pretextual termination.

As noted, the Termination Letter is vague; it does not even cite to the events of

September 26, 2016 as the reason for Plaintiff's termination. (*See* Termination Letter).

Furthermore, Baussiquot provides an alternative explanation — that Akal terminated him with

discriminatory motives (*see* Pl.'s Resp. 12), as evidenced by his supervisors' refusal to allow

Baussiquot to attend his quarterly firearm re-qualification late (*see* Pl.'s Dep. 268:11–23).[6]

Drawing all reasonable inferences in Baussiquot's favor, the Court finds he raises a genuine

issue of material fact as to pretext. Therefore, summary judgment as to Counts IV and V is

denied.

## IV. CONCLUSION

Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

---

[6] Akal argues since its attendance records contradict Baussiquot's testimony that several officers arrived late to prior quarterly firearm re-qualifications, Baussiquot's testimony should be discounted. (*See* Def.'s Mot. 18 (citing *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013))). It is not clear Baussiquot's testimony is contradicted by Akal's records; individuals may have been allowed to arrive late without their tardiness being recorded.

1. Akal Security's Motion for Summary Judgment **[ECF No. 23]** is **GRANTED IN PART** and **DENIED IN PART**.

2. Baussiquot's Motion for Partial Summary Judgment **[ECF No. 25]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 7th day of May, 2018.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record